UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

WILLIAM REYES,

                    Petitioner,

      -against-

SUPERINTENDENT ERCOLE,

                 Respondent.

------------------------------------------------------------

06-Cv-5525 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

     Petitioner William Reyes was convicted of rape and sexual abuse in New York state court in 2003 and sentenced to eighteen years in prison. He filed this petition in 2006 pursuant to 28 U.S.C. § 2254. After this Court denied the petition in 2009, the U.S. Court of Appeals for the Second Circuit granted Reyes a certificate of appealability for the limited purpose of remanding the case for further consideration of the merits of two of petitioner's claims, which alleged due process violations resulting from (1) perjury at trial and (2) withholding of exculpatory evidence in disregard of *Brady v. Maryland*, 373 U.S. 83 (1963). The Second Circuit also directed the Court to make factual findings on three matters relevant to those claims.

     For the reasons set forth below, the Court denies Reyes' petition with respect to both remaining claims, but grants a certificate of appealability as to the perjury claim.

## Table of Contents

I. Background ...................................................................................................................2

II. Discussion ...................................................................................................................4

  A. Legal Standard .........................................................................................................4

  B. Petitioner's Due Process Claim Based on Perjured Testimony Is Denied......................6

    1. Some, but Not All, of the Alleged Inconsistencies Were Likely the Result of Perjury..................................................................................................................7

      a. Martinez Did Not Commit Perjury by Testifying that She Had No Personal Conversations with Reyes.......................................................................................8

      b. Martinez Committed Perjury By Testifying that She Told Someone at the Group Home that Reyes Kissed Her Against Her Will. ....................................11

      c. Martinez Committed Perjury by Testifying that She Did Not Volunteer to Accompany Reyes to the Boat. ............................................................................14

d.  Martinez Committed Perjury by Testifying that She Was Not Attracted to Reyes. ......................................................................................................................15

e.  Martinez Did Not Commit Perjury by Testifying that She Was Unable to Use Her Cell Phone in the Group Home. ...................................................................17

2.  There Is a Reasonable Likelihood that the False Testimony Could Have Affected the Judgment of the Jury. ............................................................................................19

3.  However, the Prosecution Did Not Know, Nor Should It Have Known, of the Evidence Suggesting Perjury at Trial. .......................................................................20

4.  Petitioner Did Not Waive his Claim by Failing to Uncover, Through Due Diligence, the Evidence Suggesting Perjury in Time for Trial or Direct Appeal. .21

C.  Petitioner's *Brady* Claim Is Denied.....................................................................................23

D.  A Certificate of Appealability Is Granted as to the Perjury Claim. ..............................23

III. Conclusion ..........................................................................................................................24

## I.  Background

In the summer of 2002, petitioner William Reyes was working as a manager at the concession stand of Circle Line Cruises, a sightseeing boat company in Manhattan.  He was twenty-nine years old and the father of two young daughters.  Jane Martinez was a seventeen-year-old high school student with an infant son, living at Catholic Guardian Society Home, a group home for young mothers.  Martinez began working at the Circle Line concession stand, under Reyes' supervision, on June 27, 2002.  (*See* Trial Transcript ("Tr."), Doc. 9 at 34–38, 41–45, 348–57, 372–73, 406–07.)

According to Martinez, Reyes forcibly raped her on a boat at the Circle Line pier on July 2, 2002, her fourth day on the job.  Petitioner insists the sex was consensual.  (*Id.* at 52–74, 352–68.)  After a jury trial in New York Supreme Court, New York County (Justice Bernard Fried presiding), at which both Reyes and Martinez testified, Reyes was convicted of rape in the first degree and two counts of sexual abuse in the first degree.  (*Id.* at 555–58.)  He was sentenced to eighteen years in prison.  (Sentencing Transcript, addendum to Doc. 9 at 29.)

After an unsuccessful direct appeal,[1] Reyes moved *pro se* to vacate his conviction in state court based on newly discovered evidence pursuant to New York Criminal Procedure Law § 440.10(1)(g).  (*See* Notice of First 440 Motion, Doc. 7 Ex. G.)  Petitioner's new evidence

---

[1] *See People v. Reyes*, 17 A.D.3d 205 (1st Dep't 2005); *People v. Reyes*, 5 N.Y.3d 768 (2005).

consisted of an affidavit from Barbara Womack, a Circle Line employee contacted by Reyes' wife after the trial, and an internal investigative report or "timeline" prepared by FLIK International, Circle Line's parent company, in the aftermath of the 2002 incident. Reyes came into possession of the FLIK Report in 2004 from discovery produced in another litigation – a civil lawsuit filed by Martinez against several defendants, which apparently ended in settlement. (*See* Pet.'s Statement of Facts, Doc. 3 ¶¶ 8, 49, 57–58 & n.8.) He argued that the new evidence supported his account of the July 2 incident in various ways.

Petitioner's Section 440 petition was denied without a hearing by Justice Ruth Pickholz of the New York Supreme Court, New York County. In a July 2006 order, Justice Pickholz reasoned that Reyes failed to exercise due diligence to uncover the report in time for trial and, further, that none of his newly proffered evidence was material or likely to change the verdict. (2006 Pickholz Order, Doc. 7 Ex. I.) The Appellate Division, First Department, denied him leave to appeal the decision. (Certificate Denying Leave, Doc. 7 Ex. L.)

Reyes filed a petition pursuant to 28 U.S.C. § 2254 in 2006, seeking a writ of habeas corpus on the basis of six claimed violations of his constitutional rights.[2] (Original 2254 Petition, Doc. 1.) The petition was referred to Magistrate Judge Kevin N. Fox, who appointed Stephanie M. Carvlin, Esq., as CJA counsel for petitioner in 2008.

Reyes then filed an amended petition; in 2009, this Court adopted the Report and Recommendation of Judge Fox to deny the petition and declined to grant a certificate of appealability. *Reyes v. Ercole*, No. 06-CV-5525, 2009 WL 790104, at *1 (S.D.N.Y. Mar. 25, 2009). Reyes moved for a certificate of appealability in the U.S. Court of Appeals for the Second Circuit. The Second Circuit granted his motion for the limited purpose of remanding the case

---

[2] Petitioner argued that

> his confinement by the State of New York is unlawful because (1) his conviction was against the weight of the evidence and thus violated due process, (2) newly discovered exculpatory evidence demonstrates that his right to due process and a fair trial were denied when the prosecution's witness committed perjury, (3) the prosecutor violated the Fourteenth Amendment by failing to disclose the exculpatory evidence, (4) the trial court improperly admitted evidence of the victim's emotional response to the rape and prior history of sexual abuse into the record, (5) prosecutorial misconduct during jury selection deprived him of a fair trial by an impartial jury, and (6) his trial counsel provided ineffective assistance.

*Reyes v. Ercole*, No. 06-CV-5525, 2009 WL 790104, at *1 (S.D.N.Y. Mar. 25, 2009). Of these six claims, four are no longer at issue, after this Court denied relief and the Second Circuit declined to grant a certificate of appealability with respect to them.

for further consideration of two of petitioner's claims – based on alleged perjury and *Brady* violations – and otherwise denied the motion and dismissed the appeal. (Mandate, Doc. 38.)

The Second Circuit's 2009 mandate directed this Court to make factual findings on three separate questions. Based on the decision of the United States Supreme Court in *Cullen v. Pinholster* that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," 563 U.S. 170, 181 (2011), this Court declined petitioner's subsequent request for an evidentiary hearing on remand. *Reyes v. Ercole*, No. 06-CV-5525, 2011 WL 1560800, at *2 (S.D.N.Y. Apr. 25, 2011).

This Court stayed this action for more than four years at the request of petitioner's counsel – from January 13, 2011, until April 22, 2015 – to allow Carvlin and her investigator, Joseph Dwyer, to investigate further and to seek additional relief in New York state court. (*See* Endorsed Letters, Docs. 50 & 70.) During that time, petitioner filed a second Section 440 petition in New York state court, which was adjudicated and denied by Justice Pickholz. (*See* Notice of Second 440 Motion, Doc. 78 Ex. 1.) That petition advanced three claims – perjury, actual innocence, and ineffective assistance of counsel – on the basis of a series of affidavits from newly contacted witnesses who had not testified at trial. For reasons addressed in relevant detail below, Justice Pickholz denied the first two claims in a July 2013 order and the third in a December 2013 order, after hearing testimony from several witnesses over three days in October and December 2013. (*See* 2013 Pickholz Pre-Hearing Order, Doc. 78 Ex. 4; 2013 Pickholz Post-Hearing Order, Doc. 78 Ex. 6; Oct. 2013 Transcript ("H.") & Dec. 2013 Transcript ("H2"), Doc. 71 Ex. C.) The Appellate Division, First Department, subsequently denied Reyes' request for leave to appeal that decision. (*See* 4/21/15 Letter, Doc. 70.)

## II. <u>Discussion</u>

### A. <u>Legal Standard</u>

Reyes carries a heavy burden on this petition. The governing statute, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation omitted). Pursuant to 28 U.S.C. § 2254(d), as amended by AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Section 2254(d)(1), "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" those holdings if it "applies a rule that contradicts the governing law," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent"; the decision constitutes an "unreasonable application" if it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case," or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 405–07. In sum, for the writ to issue, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (internal quotation omitted).

The threshold for establishing an "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), is also very high. Relief cannot be granted if "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (internal quotation and alteration omitted). In addition, in this Circuit a "federal habeas court must assume that all factual determinations made by the state court were correct unless the petitioner rebuts those findings by clear and convincing evidence," pursuant to 28 U.S.C. § 2254(e)(1). *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 120 (2d Cir. 2015).[3]

---

[3] According to Section 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

These highly deferential standards apply here because Reyes' claims were adjudicated on the merits in state court.  As recounted above, over the course of petitioner's two Section 440 petitions, the New York County Supreme Court, Justice Pickholz, considered and rejected Reyes' arguments in a series of three detailed and substantive orders, and the Appellate Division, First Department, denied leave to appeal from those decisions.  This Court therefore "looks through" those summary orders to Justice Pickholz's "reasoned state judgment," to which it must defer.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).

However, as to specific factual questions on which "the state court in this case explicitly refused to make any factual finding," no deference can attach.  *Ortega v. Duncan*, 333 F.3d 102, 106 (2d Cir. 2003) (citing *Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir. 2003) (per curiam)).  On such matters, petitioner bears only the normal background burden of proof by a preponderance of the evidence.  *Id.*; *see also Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012).  The Court must also take care to defer to any factual findings implicitly made by the state court.  *Channer*, 320 F.3d at 195.

**B.**  **Petitioner's Due Process Claim Based on Perjured Testimony Is Denied.**

On the first claim remanded for further consideration by this Court, Reyes contends that the admission of perjury at trial violated his constitutional right to due process.  The Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).[4]  That principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness"; indeed, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

---

[4] The Second Circuit's mandate instructed this Court to determine "whether the prosecution knew, *or should have known*, of the perjury."  (Mandate at 2 (emphasis added).)  The Court will accordingly consider the constructive as well as actual knowledge of the prosecution at trial.

Reyes also contends that he may obtain relief, even without proving that the prosecution had constructive knowledge of the perjury, "if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  *United States v. Ferguson*, 676 F.3d 260, 282 n.19 (2d Cir. 2011) (internal quotation and alteration omitted).  That additional ground for relief is found only in Circuit precedents arising from direct appeal of a district court decision, and hence is not "clearly established federal law" applicable to this case.  *See Channer v. Brooks*, 320 F.3d 188, 196 (2d Cir. 2003) (per curiam).

To adjudicate this claim, the Court must determine "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, . . . and ([3]) whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs*." *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003).[5] Perjury is committed when a witness "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Finally, in this Circuit, "at least for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness." *Shih Wei Su*, 335 F.3d at 127.

For the reasons that follow, although petitioner shows the admission of some perjured testimony at his trial, he has failed to meet at least one of the additional requirements to obtain relief on this claim.

1. <u>Some, but Not All, of the Alleged Inconsistencies Were Likely the Result of Perjury.</u>

Petitioner proffers evidence purportedly showing that his due process rights were violated when "Ms. Martinez intentionally provided false testimony at Mr. Reyes' trial on five material issues." (Pet.'s Suppl. Mem., Doc. 71 at 5.) In adjudicating this claim on the merits, Justice Pickholz expressly declined to reach the question whether Martinez had in fact perjured herself. Instead, "[a]ssuming for the sake of argument that Ms. Martinez testified falsely," the state court denied the claim on the independently sufficient ground that the prosecution lacked knowledge of the evidence at issue, as addressed below. (2013 Pickholz Pre-Hearing Order at 5.) This Court took much the same tack in its 2009 order denying Reyes' habeas petition. *Reyes v. Ercole*, No. 06-CV-5525, 2009 WL 790104, at *6 (S.D.N.Y. Mar. 25, 2009).

However, the Second Circuit has directed that:

> On remand, the district court should make factual findings as to . . . *whether the alleged inconsistencies were likely the result of perjury* or, alternatively, could have resulted from the Appellant's and the victim's differing memories of the relevant events, the victim's incorrect, but not perjured, recollection, or a

---

[5] Per *Shih Wei Su*, it must also be decided whether the perjury "went uncorrected." *Id.* In this case, however, respondent does not contest the fact that none of the five alleged discrepancies identified by petitioner was discovered or corrected at trial.

difference of opinion as to the information requested – e.g., what constitutes a "personal" conversation.

(Mandate at 2 (emphasis added).)  Because there was no state court finding on this issue, it is left to this Court's *de novo* review whether petitioner has shown the admission of perjury by a preponderance of the evidence.  *See Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir. 2003) (per curiam) ("[W]here a state court does not resolve a question of fact, no presumption of correctness can possibly attach with respect to that issue."); *Ortega v. Duncan*, 333 F.3d 102, 106 (2d Cir. 2003); *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015).

The state court did, however, make one finding of relevance here.  In adjudicating another claim, Justice Pickholz found that Barbara Womack's subsequent testimony – that Martinez was attracted to Reyes and volunteered to accompany him to the boat on July 2 – "would have supported defendant's claim that the sex that occurred on the boat was consensual," had Womack testified at trial.  (2013 Pickholz Post-Hearing Order at 3.)  Although Justice Pickholz added that she did not think the effect of this support would be great, her endorsement of the testimony suggests that she made an implicit finding of Womack's credibility, which this Court cannot disturb except in accordance with the strictures of Section 2254.

With these standards in mind, the Court will consider each of Reyes' allegations in turn.

   a.  **Martinez Did Not Commit Perjury by Testifying that She Had No Personal Conversations with Reyes.**

First, Reyes contends that Martinez perjured herself by testifying that did not have any "personal" conversations with him before the day of the rape.  (Pet.'s Suppl. Mem. at 5–8.)  Her account differed markedly from Reyes' narrative.  Reyes testified that he spent Martinez's first day at work training her and speaking with her about numerous personal topics, including their respective relationships, and that the two got to know each other in the days before a consensual sexual encounter.  (Tr. at 353–59; 405–09.)  The key portion of Martinez's trial testimony on direct examination reads as follows:

Q [ADA Candace McLaren]: What day of work did you meet the defendant?

A [Martinez]: The second day.

Q: And on that day, did you have any extensive conversations with him?

A: No.

Q: Did you talk to him about anything personal?

A: No.

Q: Did you talk to him about your relationship with your boyfriend?

A: No.

Q: Did you talk to him about your son?

A: No.

Q: Did you talk to him about how you were looking for a relationship with a responsible individual?

A: No.

Q: Did you hear him talk to you about his relationships?

A: No.

Q: Did he talk to you about his girl friend?

A: No.

Q: Did he talk to you about his children?

A: No.

Q: Did he talk to you about any relationship problems he was having?

A: No.

(*Id.* at 441–42.)

According to the FLIK Report, however, Martinez previously told an agent of her employer that she and Reyes had indeed discussed topics plausibly deemed "personal":

> Jane began by stating that when she first started at the Circle Line, William asked her about herself, where she lived etc. Jane responded to all his questions with the correct answers. Just a day or so after she started working, Jane said William asked her where she had gotten a hickey that was on her neck. Jane responded that it was from her boyfriend. She said William then replied to her, "Well you're not allowed to have one unless I give it to you". Jane then explained how a day or so later, William asked Jane if her boyfriend could help him move something into a van off duty. Jane said she agreed and her boyfriend helped.

(FLIK Report, Doc. 71 Ex. B at 4–5.) The interactions involving the hickey and the van are also corroborated by interview notes produced to Reyes by the prosecution pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961).[6] (*See* Doc. 71 Exs. F & G.)

---

[6] Reyes also testified about the incident involving the van, although – oddly but of no evident relevance here – he reported it was Martinez's brother, not her boyfriend, who provided him assistance. (Tr. at 409.)

This evidence casts doubt on the accuracy of Martinez's trial testimony denying any personal conversations with Reyes. But petitioner has not shown by a preponderance of the evidence that the discrepancy is the result of perjury, as opposed to "inaccurate testimony due to confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).

First of all, none of the specific denials by Martinez, as limned above, are directly contradicted by the subsequently discovered evidence. For instance, it would be a stretch to characterize petitioner's inquiry into the source of a hickey on Martinez's neck as a conversation "about her relationship with her boyfriend."[7] Moreover, one of petitioner's new pieces of evidence arguably bolsters Martinez's narrative of their interactions, and undermines his own, on a key point. Reyes testified at trial that he talked to Martinez from the beginning about his relationships with his girlfriend and his wife, (Tr. at 358–59), but the affidavit of Tyesha Burroughs, a fellow resident of the group home, represents that "[s]oon after Jane started working at the Circle Line, . . . Jane asked me whether I knew if William had a girlfriend or wife." (Burroughs Aff., Doc. 71 Ex. J ¶ 6.) The asking of the question to Burroughs suggests that Reyes had not already told Martinez the answer. It is possible, of course, that Reyes had told her the answer and she was attempting to corroborate his information through a third party.

More broadly, the language of the catch-all inquiry that opened the line of questioning on this topic at trial – "Did you talk to him about anything personal?" – is ambiguous enough that Martinez may honestly have considered its scope not to include matters such as the introductory information she provided at the start of her employment, or the communications involved in arranging to help Reyes move an item into his van. *Cf. United States v. Kerik*, 615 F. Supp. 2d 256, 273–74 (S.D.N.Y. 2009) (the question "whether there was anything embarrassing that [the defendant] would not want the public to know about" was phrased at such a "level of abstraction" as to "render[] the term 'embarrassing' fundamentally ambiguous," and hence could not support a perjury charge).

---

[7] Petitioner also makes much of a passage in the FLIK Report suggesting that Reyes may have known Martinez's home address: "When asked if William knew where Jane lived she said yes not only the neighborhood in which she lived but also the address of her home." (FLIK Report at 5.) Petitioner would have the Court infer from this that the two must have talked at some length to exchange such specific personal information. But Martinez herself offered a plausible alternative explanation in a pretrial hearing before Justice Fried, suggesting that Reyes knew where she lived "[b]ecause he was my manager and he had a hold of my application." (Tr. at 11.)

On the one hand, petitioner seems correct to say that "talking about receiving a hickey from one's boyfriend clearly falls into the ambit of personal," however the term is defined. (Pet.'s Suppl. Mem. at 8.) But it is possible that Martinez didn't consider this exchange – in which her only participation was to answer a question from Reyes – to count as *her* talking about something personal. It is also possible, and even likely, that she innocently forgot about this single personal comment when asked a broad question on the stand. After all, she had previously testified that Reyes was "fresh" and "too loose" with her, "act[ing] like he knew me for a long time." (Tr. at 49.) That testimony suggests that Martinez had no intention of concealing from the jury the fact that she had at least some arguably "personal" interactions with Reyes at work. "Differences in recollection do not constitute perjury," *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009), and petitioner has not met his burden to show that Martinez's statements on this subject were willfully false.

> **b.** **Martinez Committed Perjury By Testifying that She Told Someone at the Group Home that Reyes Kissed Her Against Her Will.**

Second, petitioner argues that Martinez falsely testified that she had told Charise Pearson – a "mentor" or counselor at the group home where Martinez lived in 2002 – that Reyes kissed Martinez against her will on one of her first three days working at Circle Line. (Pet.'s Suppl. Mem. at 8–11.) The *Rosario* material indicates that Martinez repeated this claim – that she informed Pearson of the nonconsensual kiss on the day it occurred – in at least four interviews with prosecutors and police officers, including NYPD Detective Lissette Sassok, prior to Reyes' trial.[8] By Reyes' account, the kiss was consensual and initiated by Martinez, not him. (Tr. at 416.) Martinez's contrary characterization of the incident – as buttressed by the assertion that she made a contemporaneous complaint to an acquaintance – arguably supported the prosecution's argument that Reyes "targeted" Martinez as a victim after identifying her as someone he believed he could "take advantage of." (*Id.* at 489, 491.)

Subsequently adduced evidence suggests that Martinez did not in fact report the kiss at the time. Pearson, the group home counselor, did not testify at trial, but she later testified –

---

[8] *See* Doc. 71 Ex. E ("D grabs cw's cheeks, kisses her, leaves. Told Ms. Cherise."); Ex. F ("He grabbed her & kissed her and she kicked him. She told Counselor Ms. Sherise what happened."); Ex. G ("grabbed face & kissed on mouth. . . . counselor → Ms. Cherise → told being harassed that night."); Ex. H ("The c/w Ms. Jane also states that on Thursday 6/27/02 she started to be harassed by the subject, he grabbed her and kissed her and she kicked him. When she got home she told Ms. Sherise what happened.").

Sassok testified at trial and confirmed that Martinez told her that Reyes had kissed Martinez on June 27, 2002. (Tr. at 277.) Sassok did not, however, testify as to whether Martinez told her that Martinez had relayed the same information to Pearson on the day of the kiss.

in a 2012 affidavit and again in person at the October 2013 hearing – that Martinez never told her about an unwanted kiss. Pearson further testified that her job protocols would have required her to report to a supervisor if any of the group home's young residents had made any such allegation of sexual harassment at work. (Pearson Aff., Doc. 71 Ex. D ¶¶ 8, 10; H. at 35–36.) At the December 2013 hearing, Martinez testified that she did *not* tell Pearson about the kiss, (H2 at 7–8, 17–18), and in fact did not tell "anyone" about it. When pressed by Justice Pickholz on the latter assertion, Martinez retreated somewhat, as shown in context below:

> Q [Carvlin]: Did you testify at the trial of this case that you told Cherise Pearson that Mr. Reyes kissed you?
>
> MR. HAMMER: Objection, judge.
>
> THE COURT [Justice Pickholz]: Did Mr. Reyes kiss you?
>
> THE WITNESS [Martinez]: Yes.
>
> THE COURT: He kissed you the day before this incident?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay.
>
> Q: And did you tell Cherise Pearson that he kissed you?
>
> MR. HAMMER: Judge, this has been asked [and] answered.
>
> THE COURT: Did you tell anybody that he kissed you?
>
> THE WITNESS: *No, I don't remember telling anyone that.*
>
> THE COURT: You might have?
>
> THE WITNESS: *Might have, but I don't remember.*

(*Id.* at 22 (emphases added).)

Martinez most likely perjured herself on this topic at trial, although not in the precise manner alleged by petitioner. Two portions of her trial testimony touch on the subject. First, on direct examination, the assistant district attorney asked Martinez if, "when [she] went home that evening," she told "anyone at the group home" about the kiss. Martinez answered "yes" three times. (Tr. at 51–52.)

Second, on cross, Martinez was specifically asked about what she told Pearson, but only in the context of a question about what she later told Sassok:

> Q [Ralph Cherchian, Reyes' defense counsel at trial]: So did you not tell Detective Sassok that it was June 27th Thursday that William allegedly grabbed you and kissed you?
>
> A [Martinez]: No.

Q: *Did you tell [Sassok]* that when you got home you told Sharice what happened?

A: Yes, not what happened.  About the kiss, yes.

(*Id.* at 137 (emphasis added).)  Petitioner's counsel then moved on to another topic of cross-examination.

Reyes now focuses on the latter exchange, framing the issue as whether Martinez falsely "testified at trial that the day Mr. Reyes kissed her she told Ms. Charise [Pearson], one of the staff members at the Catholic Guardian Home, about what had happened."  (Pet.'s Suppl. Mem. at 8.)  The problem for petitioner is that Martinez never said on the witness stand at trial that she had told Pearson about the kiss – perhaps because the question by petitioner's trial counsel was poorly formed.  By all accounts, Martinez's trial testimony on cross – that she had told Sassok that she had told Pearson about the kiss – was literally accurate.  A "complaint follow up" report completed by Sassok states that Martinez did tell Sassok that "[w]hen she got home she told Ms. Sherise what happened."  (Doc. 71 Ex. H.)  Martinez's truthful testimony as to what she told Sassok, even if "arguably misleading" by implication, is not perjury.  *Bronston v. United States*, 409 U.S. 352, 353 (1973); *cf. United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1986) ("When a witness testifies that 'A' is a fact, and then is asked if he has testified that 'A' is a fact, and he says yes, such response is truthful, regardless of whether 'A' is a fact. . . . Because these answers are literally true, they obviously cannot support a perjury charge.").

On the other hand, Martinez's more general testimony on direct – that she told some unspecified person about the kiss – appears perjurious.  The sum of the evidence clearly suggests that Martinez repeatedly lied to Sassok and other government officials in pretrial interviews when she claimed to have told Pearson about the kiss.  There is no reason to doubt the veracity of Pearson's later sworn testimony and affidavit to the effect that Pearson was never told about any kiss.  Pearson never met Reyes; she bore no evident grievance against his alleged victim and indeed testified that she liked and had a "rapport" with Martinez, whom she considered intelligent and a good mother.  (Pearson Aff. ¶ 5; H. at 35–38.)  And after hearing this testimony years later, Martinez contradicted her previous statements both at and prior to trial, stating variously that she did not tell anyone about the kiss or that she "might have" but couldn't recall.  (H2 at 7–8, 18–22.)

It is possible to construct innocuous explanations for Martinez's trial testimony on direct examination.  She may have told someone else at the group home, besides Pearson, and then forgotten not only that person's name but also the entire interaction by the time of the 2013 hearing ten years later.  Or perhaps Martinez did tell Pearson, but both Martinez and Pearson

have since forgotten that event so completely that they were both willing to testify under oath in 2013 that it never occurred.

But no evidence supports such chains of conjecture and speculation. The most likely reason that Martinez now says she did not tell anyone about the kiss at the time is that in fact she did not. Her pretrial statements on this topic – which was of obvious interest to government investigators – are loaded with inconsistencies and likely falsehoods. As noted, the *Rosario* evidence indicates that Martinez claimed in four separate interviews that she reported the kiss to Pearson. In one of those interviews, Martinez added that she also reported it to her boyfriend (but "told him not to do anything") and to Burroughs, a "friend who live[d] w/ her" at the group home. (Doc. 71 Ex. G.) But in another interview, Martinez claimed that she did *not* tell her boyfriend, because she was "scared of [his] reaction." (Doc. 71 Ex. E.) And although Burroughs did not testify at the 2013 hearing, Burroughs submitted an affidavit detailing her interactions with Martinez in 2002, which includes no mention of any such report of a kiss. (*See* Burroughs Aff. ¶¶ 6–15.)

No other candidate has been identified as the person at the group home whom Martinez testified she told about the kiss. The preponderance of the evidence now suggests that Martinez falsely testified at trial that she reported the kiss to someone at her group home.

### c. Martinez Committed Perjury by Testifying that She Did Not Volunteer to Accompany Reyes to the Boat.

Third, petitioner avers that Martinez perjured herself when she stated at trial that Reyes had ordered her to go to the boat where the alleged rape took place. (Pet.'s Suppl. Mem. at 11–14.) The parties agree that on the morning of July 2, 2002, a supervisor radioed Reyes at the concession stand and instructed him to recover several large coffee urns from "Boat Ten" on the pier. Martinez testified that Reyes "told [her] to go to boat ten," a location unfamiliar to her and which she required directions to reach, and then followed her to the boat, where he raped her. (Tr. at 55–59.) By contrast, Reyes testified that Martinez volunteered to accompany him – "[s]he said she would help me," after hearing the radio message – and that they went to the pier together. (*Id.* at 366.)

Subsequently adduced eyewitness testimony favors Reyes' account over Martinez's. Barbara Womack was a cashier at the Circle Line concession stand in the summer of 2002 and on July 2 in particular. She testified in her 2005 and 2012 affidavits that on that date, she "was present when William Reyes asked for a volunteer from the staff to go to the Circle Line boats to retrieve coffee urns that were missing from one of the stands," after which "Jane Martinez volunteered to go with Mr. Reyes to look for the missing coffee urns." Reyes then "led the way" to the boats, while "Ms. Martinez followed behind him." (Womack 2012 Aff., Doc. 71

Ex. I ¶¶ 8–12; *see also* Womack 2005 Aff., Doc. 78 Ex. 12 ¶ 3.)  Womack attested to the same series of events at the 2013 hearing.  (H. at 8–9.)

The preponderance of the evidence suggests the most likely explanation for the discrepancy between the accounts of Martinez and Reyes is that Martinez lied.  In counterargument, respondent mounts two relevant attacks on Womack's credibility. (Resp't's Suppl. Mem., Doc. 78 at 38–41.)  First, in a separate portion of her 2012 affidavit, Womack stated that, upon returning from the boat, Martinez "did not seem to be distressed or upset.  She demonstrated no unusual emotion.  Her clothing was not disarranged or disheveled."  (Womack 2012 Aff. ¶ 14; *see also* H. at 10.)  But that account was contradicted by the trial testimony of another Circle Line employee and eyewitness, Sylina King, that Martinez "looked sad, her eyes were red, her cheeks was red, her hair was kind of messed up, her shirt was tucked out of her pants."  (Tr. at 168.)  Second, Womack was convicted of two crimes – involving a forged instrument and a drug sale – in the mid-1990s.  (H. at 28.)

These objections do not provide sufficient grounds to disregard Womack's testimony in its own right, let alone to disturb an implicit credibility finding already made by the state court, as described above.  The characterization of Martinez's appearance and emotional state is of course a matter of interpretation, and in any event not directly relevant to the eyewitness testimony on the issue of whether she volunteered to accompany Reyes to Boat Ten.  And two unrelated criminal convictions, both at least sixteen years old, do not comprise a compelling reason to disregard the testimony of a disinterested witness who had no interactions with either of the parties since the time they worked together briefly in 2002.

In sum, Womack's eyewitness testimony moves the needle sufficiently to make it more likely than not that Martinez's contrary account of her trip to the boat constituted intentionally false testimony.

### d. Martinez Committed Perjury by Testifying that She Was Not Attracted to Reyes.

Fourth, petitioner alleges that Martinez falsely testified by repeatedly answering "no" when asked at trial whether she "f[ound] him attractive" or was "sexually attracted to the defendant" at any point during the time they worked together.  (Pet.'s Suppl. Mem. at 14–16 (quoting Tr. at 442–43).)  At trial, Reyes portrayed their relationship as one based on mutual attraction and flirtation, leading up to consensual intercourse instead of rape, and Martinez's denials of any attraction undercut that defense.

Two witnesses have subsequently provided statements calling Martinez's account into question.  Womack testified in her 2012 affidavit and at the 2013 hearing that she observed "more than one" occasion on which Martinez, speaking to a female coworker, expressed

romantic or sexual interest in Reyes. Womack recounted witnessing Martinez and her interlocutor "gawking over" Reyes, describing him as "cute" or "hot," representing that they "would do him" (i.e., have sex with him) "in a minute." (H. at 5–6, 20–23; Womack 2012 Aff. ¶ 7.) Burroughs stated in her affidavit that Martinez expressed a feeling that Reyes was "hot" and that "she wanted to become involved with William sexually," asking "whether [Burroughs] knew if William had a girlfriend or wife." (Burroughs Aff. ¶¶ 6, 12, 14.) Womack and Burroughs both also asserted that they had observed Martinez "flirting" with Reyes on July 2, the day of the alleged rape. (*Id.* ¶ 13; Womack 2012 Aff. ¶ 9.)

Respondent now contends that the behavior witnessed by Womack and Burroughs amounts to "a display of teenage bravado, at most," and the language attributed to Martinez "does not necessarily evidence a genuine sexual attraction." (Resp't's Suppl. Mem. at 42.) The "necessarily" in this sentence gives the game away. Although Martinez's subjective experience of attraction is of course not a matter that any proof could resolve with absolute certainty, the preponderance of the evidence now suggests that her testimony on this point was intentionally false. Petitioner has produced multiple witnesses who observed Martinez stating the opposite of what she testified to at trial, and acting consistently with her out-of-court statements, both in and out of Reyes' presence.[9]

Respondent's contrary "bravado" theory rests on mere speculation rather than any countervailing evidence. It arguably offers a plausible alternative justification for Martinez's behavior at Circle Line, to which several employees have ascribed a sexualized and unprofessional workplace atmosphere in the summer of 2002.[10] Less clear is how well it

---

[9] Respondent also objects that Womack failed to address these incidents in her first affidavit in 2005. (Resp't's Suppl. Mem. at 13, 39–40.) But Womack's two affidavits do not contradict each other, and no dark purpose need be inferred from the first document's omission of these particular details – which are relevant to, but by no means dispositive of, Reyes' guilt or innocence.

[10] See, for instance, the account givens by Womack, grill cook Willie Leverman, and cashier Tania Santiago according to the FLIK Report:

> When asked if she had ever witnessed or heard of any inappropriate behavior, [Womack] stated employees make different comments, but they are in a joking fashion. She stated that William Reyes was a "little on the perverted side". Barbara explained a situation where an employee who works on the Caliente station was standing around not busy while the rest of the employees were very busy. Barbara asked William [at the] time why that employee wasn't doing anything; she said William replied to her "because she has thunder thighs and a big butt she doesn't have to do anything".
>
> . . .

explains her repetition of similar statements in the privacy of her own home, to Burroughs. More fundamentally, the bravado hypothesis stands sharply at odds with the theory of the case presented at trial by the prosecution, which painted Martinez as a "very quiet introverted girl" with "low self esteem," specifically targeted by Reyes as an easy victim for that reason. (*See, e.g.*, Tr. at 404–05, 489–91, 505.[11]) Notably, in her 2013 hearing testimony, Martinez did not make any such attempt to rationalize away the purported sexual comments, but flatly denied making them in the first place. (H2 at 7.)

Though the Court cannot know Martinez's mind with certainty, the evidence of her previous statements and behavior suggests that she perjured herself when she testified that she was never attracted to Reyes.

### e. Martinez Did Not Commit Perjury by Testifying that She Was Unable to Use Her Cell Phone in the Group Home.

Fifth and finally, petitioner submits that Martinez perjured herself by testifying that she was unable to use her cell phone in the group home where she resided at the time of the alleged rape. (Pet.'s Suppl. Mem. at 16.) This question bears (if rather remotely) on the

---

> When asked if he had ever witnessed William make any inappropriate comments to Jane, Willie replied no more to Jane than anyone else. Willie also stated that he was aware of a relationship that was going on between Carlos and another employee who worked at the Pier Stand. Willie then explained that there was a lot of inappropriate discussion going on related to this relationship.
>
> . . .
>
> [Tania] replied that she was aware of gossiping that has been going on regarding sexual matters among employees on the boats. When asked between or among whom, she replied it was between Carlos and a woman (she could not remember her name) who was no longer employed at the Pier Stand. When asked about the details of this, Tania stated that the woman told the employees about her sexual relationship with Carlos. Carlos later told Tania that this woman was spreading untrue rumors about their relationship.

(FLIK Report at 4, 7.)

[11] For example, the prosecution's summation included the following argument:

> I submit to you, that rapists choose their victims very carefully. They rarely strike at random. And they look for people who they think they can take advantage of, people who appear to have low self esteem, people who appear to be vulnerable, people who aren't likely to be believed. And I submit to you, ladies and gentlemen, that the defendant, William Reyes, would have been hard pressed to find anyone more vulnerable, more withdrawn, more susceptible than Jane Martinez.

(*Id.* at 489.)

veracity of Martinez's account of her interactions with Serita Godby, one of three prompt-outcry witnesses who testified for the prosecution. (Tr. at 180–202; *see also* Pretrial Transcript, Doc. 8 at 17–24.) Martinez spoke to Godby by phone the evening after the rape, but waited until they met in person, the next morning, to tell her what had happened. Martinez testified that the reason for this delay was that the group home's landline phone was in a public area that would not have allowed her privacy during her conversation. (Tr. at 86, 140.) Although she admitted that she had a cell phone and a private bedroom of her own, Martinez testified that she could not have used the cell phone to talk privately with Godby that evening, for two reasons:

> Q [Cherchian]: So in fact if you wanted to discuss it with Serita you could have gone into your room and closed the door and used your cell phone?
>
> A [Martinez]: No.
>
> Q: You are saying you could not have?
>
> A: No, because at the home we are not allowed to have cell phones and there is no reception in my area.
>
> Q: You are saying that you could not use your cell phone?
>
> A: No.
>
> Q: You had never used it?
>
> A: No, not in my home, there is no signal.
>
> Q: Did you try on that evening?
>
> A: No.

(*Id.* at 141.)

In a 2012 affidavit, Rosalie Davis – a counselor at the group home in 2002 – contradicted much of this testimony. Davis confirmed that the group home's rules prohibited the residents from using cell phones, although they were permitted to possess them. Nevertheless, according to Davis, the residents, "including Ms. Martinez, often used their cell phones while on the premises of the Home," and "[t]here was no difficulty with cell phone reception at the Catholic Guardian Home." (Davis Aff., Doc. 71 Ex. K ¶¶ 14–15.) Davis testified to the same facts at the 2013 hearing. (H. at 47–48.)

These statements cast doubt on the truthfulness of Martinez's testimony here. But Davis's own credibility is undermined by the fact that on the witness stand, she disavowed another, highly significant portion of her own sworn affidavit, where she claimed to have witnessed a social worker "quizz[ing]" Martinez "about whether she had in fact been raped or whether this was another story she was making up." (Davis Aff. ¶ 12.) In fact, as Davis admitted at

the 2013 hearing, she was not even in the room during Martinez's conversation with the social worker.  (H. at 49–53.)  None of the possible explanations for the presence of this blatant falsehood in her affidavit – whether she told the lie herself and then changed her story, or whether it was inserted into her affidavit at the behest of petitioner's unscrupulous investigator, Joseph Dwyer,[12] without her bothering to read the document – gives great reason for confidence in the remainder of Davis's testimony.

Additionally, there is at least some ambiguity as to the meaning of Martinez's statement at trial that there was no reception "in my area" or "in my home."  (Tr. at 141.)  It is possible that Martinez meant that the signal was bad in her private room, as opposed to the public areas of the home – an interpretation that is at least not expressly contradicted by Davis's testimony.  Between these reasons for uncertainty and the equipoise of Martinez's word against Davis's, the preponderance of the evidence does not show that Martinez's testimony regarding her cell phone was perjury.

## 2. There Is a Reasonable Likelihood that the False Testimony Could Have Affected the Judgment of the Jury.

A showing of perjury at trial does not, without more, establish a due process violation.  Petitioner must also show a "reasonable likelihood that the false testimony *could have* affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added).

The state court did not decide this question.  Instead, as noted, Justice Pickholz denied the perjury claim "out of hand" for failure to show the separate necessary element of knowledge on the part of the prosecution.[13]  (2013 Pickholz Pre-Hearing Order at 5.)

Justice Pickholz made a somewhat related finding in the course of dismissing petitioner's claim for ineffective assistance of counsel, which is no longer before this Court.  Applying the prejudice prong of *Strickland v. Washington* – which requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[12] In 2014, the United States charged Dwyer with bribery and conspiracy to pay New York City police to access private witness information; the U.S. District Court for the Eastern District of New York then posted a public notice announcing his suspension from practice before that court.  (Notice, Doc. 78 Ex. 10.)  Dwyer pleaded guilty to one count of conspiracy to bribe a local government employee in 2016 and was sentenced to five years of probation.  *See United States v. Dwyer*, No. 15-CR-385 (S.D.N.Y. 2016).

[13] Justice Pickholz did find definitively that the evidence in the FLIK Report was "not of the type that would change the outcome of the trial, or not material to the issues at trial," (2006 Pickholz Order at 6; *see also id.* at 9–10), and that Womack's testimony as to ancillary matters such as the size of the coffee urns "would not have had a material effect on the outcome of the trial," (2013 Pickholz Post-Hearing Order at 4).  These findings have no bearing here, however, because as described none of that evidence suggests likely perjury.

proceeding *would have* been different," 466 U.S. 668, 694 (1984) (emphasis added) – the state court found it "not reasonably probable to believe" that the new witnesses' testimony, "alone or in conjunction with the other evidence that the defense presented at trial, *would have* resulted in a different outcome." (2013 Pickholz Post-Hearing Order at 5–6 (emphasis added).)

That finding – though it is due all proper deference under AEDPA – does not govern the analogous element of Reyes' perjury claim, for which "[t]he standard for setting aside a conviction . . . is less demanding than it is in the case of ineffective assistance of counsel." *United States v. Tarricone*, 11 F.3d 24, 27 (2d Cir. 1993), *withdrawn and superseded on other grounds*, 21 F.3d 474 (2d Cir. 1994). Would is not could. *See, e.g.*, *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam) ("[Defendant] need not show that he more likely than not would have been acquitted had the new evidence been admitted. He must show only that the new evidence is sufficient to undermine confidence in the verdict." (internal quotations and citation omitted)).

Indeed, the "could have" materiality bar is so low that it has been said to make relief "virtually automatic" upon a showing that the prosecution knowingly used perjury at trial. *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotation omitted). This is because "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted." *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975).

Petitioner has met this burden by a preponderance of the evidence. It is true that Martinez's credibility at trial had already been impeached, most notably when she admitted to lying on the witness stand by denying her responsibility for an incident in which she and other teenagers had set fire to a mattress. (Tr. at 40–41; 456–58.) But "the presence of other impeaching material available to the jury" does not preclude the reasonable likelihood that the newly uncovered perjury could have changed the verdict; the exposure of additional lies "could have created a sufficient doubt in the minds of enough jurors to affect the result." *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975). Though none of the perjury goes directly to the ultimate issue of Reyes' guilt or innocence, the false testimony touches on enough issues of importance that it is reasonable to suppose that it could have swayed the result at trial.

### 3. However, the Prosecution Did Not Know, Nor Should It Have Known, of the Evidence Suggesting Perjury at Trial.

Supreme Court precedent dictates that even the intentional admission of materially false testimony does not make out a claim for a due process violation if the perjury was not known

to the prosecution.  The Second Circuit has thus directed this Court to make a factual finding as to "whether the prosecution knew or should have known of the evidence suggesting perjury at trial."  (Mandate at 2.)  Fatally to petitioner's claim, the answer is no.

With respect to the FLIK Report, Justice Pickholz reasonably found in 2006 that "there is no reason to believe that the prosecution was in possession or control of the timeline [i.e., the FLIK Report], or that it even had actual or constructive knowledge of the document," which was created by a third party – FLIK – and only later divulged to Reyes in a separate litigation. (2006 Pickholz Order at 10 (citation omitted).)  The state court reasonably reached the same conclusion in 2013 as to the affidavits newly produced from witnesses who did not testify at trial and were not contacted at the time by either the defense or the prosecution.[14]  (2013 Pickholz Pre-Hearing Order at 5.)

Petitioner does not contest those findings; he now concedes, as he must, that "[t]here is no basis for concluding that the prosecution knew or should have known about" the vast majority of the evidence arrayed above.  (Pet.'s Suppl. Mem. at 27.)  The only evidence he now argues that the prosecution knew or should have known about is the *Rosario* material allegedly indicating personal conversations between Martinez and Reyes.  (*Id.* at 26–27.)  But as discussed, that evidence does not show perjury by Martinez on this point.

The knowledge requirement thus puts petitioner's claim in a difficult spot: he concedes that the prosecution had no actual or constructive knowledge of what evidence *does* suggest perjury, and the only evidence the state did know about does *not* show that Martinez perjured herself.

**4.**  **Petitioner Did Not Waive his Claim by Failing to Uncover, Through Due Diligence, the Evidence Suggesting Perjury in Time for Trial or Direct Appeal.**

The prosecution's ignorance at trial of any of the evidence now suggesting perjury suffices to defeat petitioner's claim.  However, the Second Circuit has directed this Court to make an additional factual finding as to "whether Appellant waived the claim by failing to uncover, through due diligence, the evidence in time for trial or direct appeal."  (Mandate at 2.)  A defendant can overcome this barrier "by showing that the claim is based on newly discovered evidence that could not reasonably have been discovered before."  *United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1993).

---

[14] The state court did not expressly make the same finding as to the testimony of the witnesses at the 2013 hearing.  But the same analysis applies to that testimony, which largely repeated and did not materially augment the evidence in the affidavits, as excerpted extensively above.

Petitioner has met his burden here. As analyzed above, the evidence suggesting that Martinez likely perjured herself comes from affidavits submitted by Womack, Pearson, and Burroughs, as well as live testimony by the first two of these witnesses in 2013. In dismissing petitioner's separate claim for ineffective assistance of counsel, Justice Pickholz reasonably found that Reyes' trial counsel conducted an effective investigation into potential witnesses and could not be faulted for failing to adduce testimony from these individuals at the time. (2013 Pickholz Post-Hearing Order at 2–3, 5–6.) It appears from Womack's testimony that she and other Circle Line employees were indeed approached after the incident by a private investigator for the defense, who "came offering us a card saying he wanted information on what happened."[15] (H. at 10.) But Womack refused to speak with him because she was ordered not to by her supervisor, and threatened with firing if she did. (*Id.* at 10–11; Womack 2005 Aff. ¶ 4; Womack 2012 Aff. ¶ 17.) Under these circumstances, it does not appear that reasonable further efforts by defense counsel would have made a difference in securing Womack's testimony. And as Justice Pickholz reasonably observed, "few attorneys would have considered that Charise Pearson . . . who[] worked at the Catholic Guardian Home, might provide testimony that was favorable to the defense," given that she was not a witness to "any of the events at the pier." (2013 Pickholz Post-Hearing Order at 5.)

Justice Pickholz did reasonably rule, as to the FLIK Report, that Reyes "has not established that he could not have discovered its existence before trial with due diligence." (2006 Pickholz Order at 5.) As the state court explained, the document appears to have been "completed well before trial," but Reyes "apparently made no effort to subpoena Circle Line or its parent company for employee records and materials pertaining to the incident" – despite the fact that "the assistant district attorney provided the defense with discovery material clearly indicating that FLIK's human resources department had been notified of the incident and that a department representative was present when [Reyes' boss] Khanii spoke with the complainant." (*Id.* at 6.) But as iterated and reiterated above, because at least the information in the report does not suggest likely perjury by Martinez, the lack of due diligence on this score makes no difference.

Hence, whatever the other problems with the perjury claim, the doctrine of waiver does not present an independent barrier for Reyes.

---

[15] Because Womack did not speak to the private investigator, she was unable to confirm who had hired him. (H. at 10–11.) But as Justice Pickholz found, "[i]t seems certain that the investigator was employed by the defense," given that he was apparently working independently of the police. (2013 Pickholz Post-Hearing Order at 3 & n.1.)

### C. Petitioner's *Brady* Claim Is Denied.

Petitioner's second claim on remand is that the prosecution denied him due process by withholding the exculpatory evidence in the FLIK Report from the defense at trial. (Pet.'s Pro Se Mem., Doc. 2 at 5–10.)  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Justice Pickholz denied this claim on two distinct grounds: first, as quoted above, "there is no reason to believe that the prosecution was in possession or control of the timeline, or that it even had actual or constructive knowledge of the document," and second, "none of the statements at issue constitute *Brady* material" because "although they arguably provide material for impeachment, the statements are not exculpatory." (2006 Pickholz Order at 10 (citation omitted).)

The second of these reasons was incorrect because "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule."  *United States v. Bagley*, 473 U.S. 667, 676 (1985).  But the first reason – the dearth of any evidence that the government possessed or even knew about the FLIK Report – remains uncontradicted.  The state cannot suppress evidence of which it is unaware.  *See, e.g.*, *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006).  As addressed above, petitioner has presented no evidence to show that Justice Pickholz's finding on this first point was erroneous, let alone unreasonably so.  *See Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (where one "ground was sufficient to reject [a] claim, . . . it is irrelevant that the court also invoked a ground of questionable validity").

### D. A Certificate of Appealability Is Granted as to the Perjury Claim.

Pursuant to 28 U.S.C. § 2253(c)(2), the Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  As interpreted by the Supreme Court, "[t]hat standard is met when 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner.'"  *Welch v. United States*, 136 S. Ct. 1257, 1263 (2016) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Dismissing Reyes' perjury claim requires a sufficient number of judgment calls – in particular, on the questions whether (and which) discrepancies identified by Reyes amount to willful falsehoods – that reasonable minds can differ with the conclusion reached above.

**III. Conclusion**

For the foregoing reasons, the Court finds that:

1. Some, but not all, of the alleged inconsistencies in Martinez's trial testimony were likely the result of perjury;

2. Petitioner did not waive his perjury claim by failing to exercise due diligence; and

3. The prosecution did not know, nor should it have known, of any of the evidence suggesting likely perjury at trial.

IT IS HEREBY ORDERED that:

1. The petition pursuant to 28 U.S.C. § 2254 is denied;

2. As petitioner has made a substantial showing that reasonable jurists could find it debatable whether he was deprived of his constitutional right to due process of law by the knowing use of perjured testimony at trial, a certificate of appealability shall issue with respect to the perjury claim. Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c); *Welch v. United States*, 136 S. Ct. 1257, 1263 (2016); and

3. As petitioner has not made a substantial showing of the denial of a constitutional right with respect to the alleged violation of his rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), a certificate of appealability shall not issue with regard to that claim. 28 U.S.C. § 2253(c)(2); *Middleton v. Attorneys Gen. of N.Y. & Penn.*, 396 F.3d 207, 209 (2d Cir. 2005) (per curiam).

Dated: New York, New York
      March 26, 2018

SO ORDERED:

Sidney H. Stein, U.S.D.J.